## O'Malley Will.

Argued April 2, 1952. Before DREW, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*John A. Metz, Jr.,* with him *Metz & Metz,* for appellant.

*Adolph Goldberg,* with him *Virgil N. Caputo,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, April 22, 1952:

The appeal is from a decree of the Orphans' Court of Allegheny County refusing to vacate a decree of probate in order to permit the probate of a later alleged last will and testament.

Hannah O'Malley died April 19, 1949, aged about seventy-five years, unmarried and without issue. Ap-

parently her only next of kin was a sister, Ellen Scattergood. A holographic purported last will and testament dated Sept. 1948 was probated on April 25, 1949 and letters of administration *cum testamento annexo* were issued to a sister-in-law, Christine O'Malley, one of the beneficiaries named in the will. The estate consists of personal property inventoried at $14,471.81. The beneficiaries named in the probated will are testatrix's sister, Ellen Scattergood; Ellen's daughter Rose; a sister-in-law, Christine O'Malley; Christine's daughter, Delorous O'Malley; and "her sister Gabriel Mervis."

On September 29, 1949, Lucille M. Concannon filed an appeal from the decree of probate seeking to vacate such probate in order to permit the probate of an alleged later will dated February 3, 1949, which reads as follows:

"to my sister Ellen Scattergood 100.0 to each of them and her my sister the same and for Masses for my soul 5.00. I want all debts paid I leave to the little flower monastery 5.00. for Masses

"and I, bequest and leave all my earthly possessions of any value on earth to,

Lucille M. Concannon

That this Will was made in good faith and of my own sound mind on this day, Feb 3, 1949.

Witnessed̶ by C. T. Getz.

Hannah O. Malley"

Answers and objections in the nature of demurrers were filed to the petition on the ground that on the face of the document it appeared that it was not signed at the end thereof and that it was a vague, unintelligible and incoherent writing ineffective and meaningless as a dispositive testamentary instrument. The court in banc overruled the objections and directed answers to be filed upon the merits. Answers were filed and hearings had upon the petition and answers.

The hearing judge, in an opinion and decree of June 20, 1950, dismissed the petition upon the ground that it was not signed by decedent at the end thereof. On exception the court in banc, in its opinion of January 19, 1951, sustained exceptions and directed "that the record be returned to the trial judge for adjudication by him of the issues of lack of testamentary capacity, undue influence, and forgery."

The hearing judge after reconsideration of the evidence upon return of the record, again dismissed the petition by his opinion and decree of February 28, 1951. He sustained the charges of testamentary incapacity, undue influence and forgery, and decided that there existed no substantial dispute, and hence declined to award an issue *devisavit vel non* as requested by contestants (respondents). The court in banc approved the decree dismissing the petition. This appeal followed.

The learned hearing judge accurately expressed the nature and scope of the duty of a hearing judge in the orphans' court upon an application for an issue *devisavit vel non.* He said: "The duty of the hearing judge now is to determine whether the evidence discloses the existence of a substantial dispute of material fact relative to any of the further questions involved (Lare Will, 352 Pa. 323; Lewis Will, 364 Pa. 225). If it does, he must on timely request, award an issue or issues for trial by a jury (DeLaurentiis' Estate, 323 Pa. 70) and may do so of his own motion (Cross's Estate, 278 Pa. 170). Here petitioner makes no request for the grant of issues but respondents do so.

"Although limited to the single inquiry as to whether the evidence discloses the existence of a substantial dispute and mandated not to constitute himself the trier of facts, nevertheless, the hearing judge must weigh and consider all the evidence in order to ascertain if the dispute be substantial (Lare Will, supra,

p. 336). Mere conflict in the testimony is not enough (Guarantee Trust & Safe Deposit Company v. Heidenreich, 290 Pa. 249, 251). As seen in Higbee Will, 365 Pa. 381, 383, 'there can be no substantial dispute where a verdict of a jury . . . would have to be set aside as against the weight of the evidence.' Finally, the evidence must be 'of the probative value required by our decisions' (Cross's Estate, supra, p. 185) as well as 'credible and trustworthy' (DeLaurentiis' Estate, supra, p. 77)."

The hearing judge, in his earnest and conscientious effort to do justice as he viewed it, nevertheless, transgressed the rules he so accurately stated. He did constitute himself as a jury and decide the case as he would have done had he been acting in the capacity of an ultimate fact-finding tribunal. Our independent reading of the testimony causes us to negative the judge's assertion that the proof submitted is of such nature, quality and weight that irrefutably proved testamentary incapacity, undue influence and forgery, and rendered the award of an issue unnecessary. Upon the contrary an issue of fact is clearly raised which must be submitted to a jury.

Upon its face the paper writing offered for probate is testamentary in character and entitled to probate, its interpretation remaining for subsequent consideration by the court. Testatrix's signature was proven by one *subscribing* witness and by two *attesting* witnesses, which complied with the Wills Act of April 24, 1947, P. L. 89, sec. 4, 20 PS 180.4.

As the execution of the will was thus proven (*Ash Will,* 351 Pa. 317, 41 A. 2d 620), the burden rested upon contestants (the respondents herein) to establish their allegations of (a) testamentary incapacity: *Lawrence's Estate,* 286 Pa. 58, 132 A. 786; *Sturgeon Will,* 357 Pa. 75, 53 A. 2d 139; (b) undue influence: *Cookson's Estate,* 325 Pa. 81, 188 A. 904; *Ross Will,* 355 Pa.

112, 49 A. 2d 392; and (c) forgery: *Brehony v. Brehony*, 289 Pa. 267, 137 A. 260; *Rosenthal's Estate*, 339 Pa. 488, 15 A. 2d 370. (Forgery exists not only where a signature is simulated, but where one "fraudulently makes, signs, alters, utters or publishes . . . any written instrument": The Penal Code: Act June 24, 1939, P. L. 872, sec. 1014, 18 PS 5014).

Decedent was a retired, illiterate domestic who had accumulated over $14,000; she died at the age of approximately seventy-five; she was devoutly religious; the medical testimony was that decedent suffered from senile deterioration; her sister, sister-in-law and a neighbor testified that she was confused mentally, was nervous, forgetful, and was slovenly and careless about her person and maintained a dirty apartment. But it was testified by the sister and sister-in-law that shortly before the execution of the questioned document, they had accompanied decedent to her lawyer's office and executed and acknowledged a deed for real estate, attended a real estate settlement, and received a cash payment and accepted a mortgage; that she received a check for $4,400 at the settlement which she kept and later deposited. The settlement clerk testified to this effect; it also appeared that decedent had maintained active bank accounts, according to the bank officers who proved her signature to the questioned will. While under this unsatisfactory record, as presented, the evidence of testamentary capacity is rather weak, we are not prepared to declare that there is insufficient evidence to raise an issue of fact as to testamentary capacity.

The record is wholly barren of evidence of undue influence on the part of Lucille M. Concannon, the proponent. Nowhere in the testimony does it appear that proponent said anything or did anything which indicated that she stood in a confidential relation to decedent. She was a roomer who worked each day and

who paid room rent and shared expenses of food. See *Brunier v. Stanert,* 369 Pa. 178, 85 A. 2d 130. The statement of the hearing judge is but a conclusion not supported by the evidence that ". . . through daily contacts [proponent] could not have escaped notice of the physical and mental decline of [decedent]. Their living together in community of household and other interests is demonstrative of a situation described by the law as a confidential relationship. . . ."

The fundamental and basic contest in this case is that of *forgery*. The question is whether decedent was tricked into signing a fraudulent will, or whether words beneficial to proponent were inserted by proponent, without the knowledge of decedent before or after the execution of the paper.

Upon its face the document is an object of just suspicion. It consists first of seven lines written by the decedent in her own labored handwriting with its meaning almost unintelligible except perhaps to bequeath $100 to her sister Ellen Scattergood and two $5 bequests for Masses. Following are nine lines written by proponent, Lucille M. Concannon, in her excellent, Spencerian handwriting, the effect of which is to bequeath to proponent the residue of the $14,000 estate, and thus to pass the estate to one not of the blood, and disinherit her kin.

The document is witnessed by C. T. Getz, its sole *subscribing* witness. This witness, who was a friend of decedent, was not related to the proponent. The witness testified at great length and was vigorously cross-examined. He stated that he was present when decedent wrote the first seven lines and proponent wrote the nine remaining ones; that he saw decedent sign the paper and that he signed as a witness in the presence of both decedent and proponent. The witness testified that after decedent wrote the first seven lines she handed the pen to proponent who wrote the remain-

ing nine lines. From the testimony it is doubtful what decedent *told* proponent to write. However, as the hearing judge correctly said in his opinion: *"Mr. Getz did say that [proponent] read the paper to [the decedent], that the latter read it and that [witness] read it, after which execution took place."* The hearing judge regarded the subscribing witness as "entirely unreliable"; he considered his testimony as "lacking in the probative value" and in the "trustworthiness" required; the judge disbelieved his testimony. Despite the unusually lengthy and minute examination and cross examination we can discover no reason for the orphans' court hearing judge to thus discredit this testimony. The judge when he so acted usurped the function of a jury and that of a chancellor who is required to hear the *will contest*. A clear issue of fact was presented by this case (a) as to decedent's mental capacity and (b) whether the questioned document was forged and therefore fraudulent.

Decree reversed and the court below is directed to award an issue *devisavit vel non* as indicated in this opinion. Costs to abide the event.